UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CHRISTOPHER CHANDLER,

     **Plaintiff,**

v.                                                        **CASE NO. 3:21cv507-MCR-ZCB**

MICHAEL A ADKINSON, JR
IN HIS OFFICIAL CAPACITY
AS SHERIFF WALTON COUNTY
FLORIDA,

     **Defendant.**

_____/

## ORDER

Plaintiff Christopher Chandler brought suit in the Circuit Court in the First Judicial Circuit in and for Walton County, Florida, against the Sheriff of Walton County in his official capacity ("Sheriff"), alleging disability discrimination and retaliation under Florida Statutes § 760 (Counts I and II), and claims of interference and retaliation under the Family and Medical Leave Act, 29 U.S.C. § 2601, *et. seq.* ("FMLA") (Count III). The Sheriff timely removed the case to this Court on grounds of federal question and supplemental jurisdiction. *See* 28 U.S.C. § 1331, 1367(a), 1441(a). Now pending is the Sheriff's Motion for Summary Judgment, ECF No. 14. Having fully reviewed the matter, the Court finds that the motion is due to be granted.

## I.     Background[1]

Chandler was employed by the Sheriff in the Walton County Fire Rescue Department from September 7, 2007, until his termination on October 26, 2018.  In June 2018, Fire Chief Russell Beaty promoted Chandler to lieutenant.  Immediately prior to his promotion, Chandler had been working as a Firefighter Paramedic on a fire engine at Station 8 in Red Bay, Florida,[2] and also frequently was assigned to overtime shifts on an ambulance at Station 4, located in DeFuniak Springs, Florida.  Chandler described Station 4 as the busiest station in the County, with more ambulance calls than Station 8.[3]  In July 2018, with his promotion to lieutenant, Chandler was transferred to Station 4, where he worked on an ambulance.[4]  His supervisor at Station 4 was District Chief David Hatfield.

---

[1]  For the limited purpose of this summary judgment proceeding, the Court views "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party," which in this case is the Plaintiff.  *Martin v. Brevard County Pub. Sch.*, 543 F.3d 1261, 1265 (11th Cir. 2008) (internal marks omitted).

[2]  At Station 8, Chandler's supervisors included District Chief Tim Turner, District Chief Brad Newsome, District Chief James McMillian, and Fire Chief Russell Beaty.

[3]  Consistent with Chandler's characterization, District Chief Tim Turner stated that Station 8 is a remote station that generally receives fewer calls so the paramedics at that station do not have the same opportunity to practice their paramedic skills as do paramedics at other busier stations.  ECF No. 13–11.

[4]  Several other individuals promoted to lieutenant in 2017 and 2018 were also moved to other stations, including Station 4.  ECF No. 13–1 at 92–96.  And many of the Chiefs were located at Station 4.

## A.    Disability

Chandler suffers from depression, post-traumatic stress disorder ("PTSD"), and attention deficit hyperactivity disorder ("ADHD").   Chandler first sought treatment for depression and PTSD in 2008 due to difficulty sleeping, difficulty maintaining a routine, and nightmares.   In his deposition, Chandler testified that sometime in 2018, before his promotion on July 1, 2018, he mentioned in a general conversation with Chief Turner that he had suffered from depression and PTSD for several years.   *See* ECF No. 13–1 at 31–32 (Chandler Depo. at 29–30).   Chandler felt his supervisors viewed him as weak due to his disabilities and treated him differently by frequently scheduling him at the last minute for mandatory overtime at Station 4.[5]   *See* ECF No. 13–1 at 38–39 ("Maybe they viewed me as weaker, maybe a problem knowing I had a disability.").   Chandler requested no accommodations, made no written report of disability discrimination during his employment, and the record does not include medical evidence of a disability.   He asserts that he was passed over when he applied for a district chief position and that he was treated differently by being scheduled overtime shifts and then transferred to Station 4.   After his transfer, Chandler requested a transfer back to Station 8, but

---

[5] When asked to give an example of the disparate treatment he suffered, Chandler responded:   "I was transferred around a good bit and changing stations."   Also, "I was moved stations. I was moved from an engine company to a -- the busiest station in the county, which was Station 4."   ECF No. 13–1 at 35.

there is no indication that he informed Hatfield that the request was due to a disability.

### B.    Report of Co-Worker Harassment

On January 13, 2018, Chandler filed a report with Chief Turner regarding harassment of co-workers, using a Sheriff's Office form and checking a box to indicate he had witnessed sexual harassment or a hostile work environment.  In his written comments, Chandler reported that bullying and harassment in the workplace and on social media had been reported by "different Firefighters" and created a hostile environment.  Chandler stated that co-workers had been "bad mouthing" each other to the point that some individuals "hated to even come to work" or would "pass up overtime in certain districts due to the extremely unprofessional behavior."  ECF No. 13–3. Chandler's report included the statement that during the recent lieutenant testing process, someone had published a social media post about an overweight female.

In his deposition, Chandler explained that he was complaining about ongoing harassment directed towards females, and he specifically referenced a female firefighter named Abbie Cook, although he had not named anyone in the report. Chandler testified that Cook had been harassed and bullied and frequently moved from station to station at the last minute.  When asked whether Cook had told him that she was being sexually harassed, Chandler answered, "No, she was being treated

different."  ECF No. 13–1 at 63–64 ("she was moved around a lot. She -- same thing that, you know, was happening with me. She was moved around a lot.").  Chandler asserts he suffered retaliation for lodging this report based on being frequently scheduled for overtime shifts at Station 4 beginning in February 2018 and then later being transferred to Station 4, which he viewed as punitive in nature.  He also asserts retaliation in that he was not promoted in the first round of lieutenant promotions[6] or for district chief[7] and he was ultimately fired in October 2018.  *Id.* at 65.  Notably, Chandler did not lose benefits or compensation due to the shift changes from one station to another or the transfer to Station 4 but argues that his duties changed because he was no longer supervising fire scenes at Station 8 but instead was supervising and attending EMS calls at Station 4.  Chief Turner stated by affidavit that Chandler did not inform him that Abbie Cook was being bullied or harassed, and based on his review of Chandler's report, it was not consistent with General Order 2–09, the Sheriff's harassment or discrimination policy, and did not reflect

---

[6] Chandler was not selected in the first round of lieutenant promotions.  He thought he likely was not selected in the first round of lieutenant promotions (late 2017 or early 2018) because there was "some good competition" and were "better qualified lieutenant candidates" who performed better on the test.  ECF No. 13–1 at 22-23 (Chandler Depo. at 20-21).  In a later affidavit, Chandler added that several of those selected were not as qualified as he was.  ECF No. 20–46

[7] Chandler vaguely states he was passed over in the promotional process for district chief as well "during this same time," which he viewed as retaliatory.  ECF No. 20–46.  The record shows that he applied for a district chief position in late February 2018, but it is unclear when the interviews were held or when the decision was made.

allegations of discrimination, harassment, or bullying concerning Cook.[8]  ECF No. 13–11.

## C.    FMLA Leave

On March 21, 2018, Chandler injured his hip while off duty and as a result, he was on protected FMLA leave through June 30, 2018, when he was released to return to work without restrictions.  Chandler stated that while he was on leave, he was harassed by one fellow firefighter, Bill Blevins, about when he would return to work.[9]  Also while on FMLA leave, Chandler was promoted to lieutenant, effective July 1, 2018.  Chandler nonetheless contends that he was placed in a much less desirable position when he returned to work—being transferred to Station 4.

Chandler maintains his duties were different at Station 4.  He described his duties as a lieutenant as supervising the crew in daily tasks, conducting performance evaluations and training, and overseeing the shift.  At Station 4, he was now the single lieutenant over three shifts at a large, busy station, and he was assigned to an

---

[8] The Sheriff's General Order 2–09 on Harassment and Discrimination provides a procedure for reporting discrimination or harassment.  The policy requires a person making a complaint to provide the name of the person complaining but also the name and  title of the person committing the harassment or discrimination, as well as witnesses and the specific nature of the harassment.  ECF No. 13–6.

[9] Chandler stated that Blevins came to his home to check on him once while he was on FMLA leave.  Chandler thought either Chief Turner or EMS Chief Tracey Vause had sent him.  Chandler said Blevins also made disrespectful comments about him on social media and in phone calls.  However, on further questioning, Chandler testified that Blevins came to his house because of a scheduling conflict, and he could not recall what was said on social media or in the phone calls. ECF No. 128-31 (Chandler Depo. at 126-29).

ambulance instead of a fire engine or fire scene.[10]  But when asked what he would do differently in his capacity as lieutenant in Station 8, he answered, "we'd do the same . . . the same general duties as a lieutenant," except that the fire training and the call volume were different; otherwise, "the same job . . . no matter what station we're at."  ECF No. 13–1 at 176–77.   Chandler also said Station 4 was where inexperienced medics were given training or lieutenants were sent as punishment. When Chandler reported to his direct supervisor, Chief David Hatfield, that he felt he was being targeted for taking FMLA leave by his transfer to Station 4, Hatfield told him that the station assignments had already been made by Chief Turner and Chief Brad Newsome.  Chandler said Hatfield also told him that he was assigned to Station 4 because he had been out on FMLA leave.  Despite Hatfield's statement, Chief Turner stated by affidavit, and Chandler acknowledged by deposition testimony, that this transfer had been planned before he went on FMLA leave, so on his return, he was transferred, and station changes were associated with the lieutenant promotions.[11]  ECF No. 13–1 at 27, 35.  Turner also explained that

---

[10]   Although Chandler had not been a lieutenant while at Station 8, he explained the difference in his responsibilities as follows.  At Station 8:  "You will be primarily responding to fire calls, as well as some EMS calls. The supervision is a little different on an engine. The responsibility is different. And that's commanding fire scenes and overseeing hazardous scenes was kind of my specialty as what I had been trained to do for my whole career, which I like to do." ECF No. 13–1 at 170.  At Station 4: "We primarily spent our time running medical calls and doing station duties," with less opportunity for him to use his fire officer skills.  *Id.*

[11] It is entirely possible to construe Hatfield's comment as consistent with Turner's, given Chandler's admission that the transfer had been scheduled before he even took FMLA leave. Chandler also acknowledged in his testimony that he and others were moved to different stations

Chandler's transfer to Station 4 was necessary to ensure he retained his skills as a firefighter/paramedic.  He stated firefighter/paramedics were routinely assigned to Station 4 for a limited period of time to increase their patient contacts for this purpose.  Chandler believed that as a long-standing employee with thousands of patient contacts documented, he was not in need of increased patient contacts and his skills could be better utilized at Station 8.

### D.    Discipline and Termination

On August 27, 2018, while Chandler was on probation in his new position as lieutenant, he failed to report to work.[12]  Chandler spoke with Turner the same day, told him that the stress of work trauma and constant overtime was impacting his home life, and he requested Employee Assistance Program information, which Turner provided.  About one month later, on September 21, 2018, Chandler had a verbal disagreement with District Chief Brad Newsome over a mandatory overtime assignment.  Newsome reported that Chandler yelled at him repeatedly, called the schedule "bullshit," and accused Newsome of being retaliatory.  Chandler disagrees with this characterization of the incident and says he did not repeatedly yell at

---

after the promotions, explaining, "that way we weren't supervising the people that we had come up with. We were supervising different people. That was the that was the main goal."  ECF No. 13–1 at 27–29.  He stated there could have been other reasons too, but that was the only official reason he knew of.

[12] Chandler stated in his deposition that this was due to a scheduling misunderstanding and stated by affidavit that he did show up, but late.

Newsome, but he admits that he was very displeased, used the word "bullshit," and accused Newsome of being retaliatory.  ECF No. 13–1 at 145–46 (Chandler Depo. at 143–44).  Despite the confrontation, Chandler complied with the schedule and worked the mandatory overtime.  On October 3, 2018, Chandler received a Notice of Proposed Discipline stating the Sheriff intended to dismiss him for insubordination, conduct unbecoming of a public employee, and failure to report to duty based on the incidents of August 27 and September 21.  The notice stated that this type of behavior is unacceptable for a supervisor and "demonstrated a blatant disregard for authority and organizational process."  ECF No. 13–2 at 21.  Chandler was placed on administrative leave with pay until the conclusion of the disciplinary process.

Chandler requested a predetermination hearing.  In advance of the hearing, he submitted a letter to Major Donald Clark, in which he apologized for his behavior, which Chandler characterized as inexcusable.  Chandler stated he understood that he was on probation as a lieutenant and regretted that his temper had gotten the best of him.  He outlined some personal issues he was dealing with and noted he was seeking mental health counseling through the Employee Assistance Program.  Chandler admitted that he had failed to report to work one day and acknowledged this as a "very bad judgment call"  He also admitted that he was disrespectful to Chief Newsome, although he disagreed with Newsome's account of the incident.  Chandler

further explained in his letter that he had heard that some supervisors assigned him to Station 4 because of his FMLA use, which he found retaliatory.   At the predetermination hearing on October 18, 2018, Chandler met with Major Clark. During the hearing, he advised Major Clark that he "felt a little singled out, discriminated against." ECF No. 13–1 at 151.  In a later affidavit, Chandler added that he also reported to Major Clark that he experienced discrimination and retaliation because of his depression and recent FMLA leave.

Major Clark concluded that Chandler had taken responsibility for his behavior, noted that Chandler was under the care of a physician and would like to continue to see a counselor, and recommended a reduced disciplinary action of demotion, placement on probation for one year, and access to the Employee Assistance Program.  The Sheriff adopted the recommendation, and by letter dated October 24, 2018, gave Chandler notice that effective immediately, he was demoted, his pay was reduced, and he was placed on probation for one year.  Chandler refused to come in and receive the letter, so it was mailed to him, and Chief James McMillian and Chief Tracey Vause spoke with Chandler about the disciplinary result by phone. Chandler testified that he refused to come in and meet personally and said he advised McMillian and/or Chief Vause that he was not coming in and would not be returning

to work demoted.[13]  ECF No. 13–1 at 155–56, 159-60.  Chandler felt the demotion was in retaliation for his January report of harassment, his FMLA use, and "just having disabilities in general."  ECF No. 13–1 at 155–56.  Chief Vause said his role was limited to informing Chandler of the outcome of his predetermination conference, which Chandler would not accept, and consequently, the decision was then made to terminate Chandler immediately.  The dismissal letter, dated October 26, 2018, explained the termination as based on Chandler's refusal to come in, because he was on administrative leave and required to report when directed to.[14]

Chandler identified two others who were not disabled and were treated differently than him; namely, Sarah Early and Chad Hooper.  Chandler had reported to Turner in August 2018 that Sarah Early was discovered "attempting to dodge a call" for a second time and that she would go home to feed her animals while on duty, and once used an ambulance to follow her husband home, fearing he was intoxicated.  She was never investigated or disciplined and was promoted.  He stated that Chad Hooper had slapped another male on the behind and told him to pick up

---

[13] Consistent with Chandler's testimony, Vause said Chandler responded, "I'm not going to accept that.  I'm not doing it.  I'm not coming back to work."  ECF No. 20–44 at 20 (Vause Depo. at 19).  By a second affidavit, Chandler added that he also told Hatfield he was suffering with PTSD and asked him to reevaluate the demotion or termination so he could obtain counseling, but the demotion letter allowed him to continue counseling.

[14] The dismissal letter is signed by Chief Deputy Jerry Bryan, who testified that his only involvement was to sign off on all termination letters.

trash but was never disciplined.[15]  *See* ECF No. 20–10 at 10 (Interrog. Answers at 9).  He referenced two others who had disabilities or were perceived as such and also were terminated as "me too" witnesses, but neither was a probationary lieutenant.[16]  He also presented the testimony of Abbie Cook, Blaine Halderson, and Corey Dickey, previously employed as EMS with the Sheriff, stating that the use of profanity was not uncommon in the workplace and they thought Station 4 was punitive.  ECF No. 20–31; 20–32.  Dickey testified that she had heard a subordinate lieutenant say "that's bullshit" to a supervisor, Hatfield, and not be disciplined.  ECF No. 20–33 at 7–8.  When asked about the circumstances, she stated, "it was just conversation about the process of what they were doing."  *Id*. at 9.

Chandler filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on the day he was terminated, asserting disability discrimination and retaliation, and later filed this suit.  The Sheriff moves for summary judgment, maintaining that all employment decisions were based on legitimate non-discriminatory and non-retaliatory reasons.

---

[15] Chandler presented other evidence as well in sur-reply illustrating Hooper's misconduct toward subordinates.  Brandon Justice testified to Hooper's misconduct but when asked whether he had heard Hooper cuss at a supervisor, he answered "No."  ECF No. 41–2 at 11.

[16] In sur-reply, Chandler maintains that a probationary lieutenant would be held to the same standards as others, but that argument does not address the probationary nature of the promotion.

## II.     Discussion

Summary judgment is appropriate where the record shows no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is "material" if, "under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004). A dispute of material fact is "genuine" if the record, taken as a whole, could persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 1260; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, courts view the evidence in the light most favorable to the nonmoving party, resolving all ambiguities and drawing all justifiable inferences in favor of that party but eschewing determinations of credibility and the weighing of evidence, which are functions properly left to a jury. *See Frederick v. Sprint/United Mgm't Co.*, 246 F.3d 1305, 1311 (11th Cir. 2001).

The moving party bears the initial burden of providing the basis for its motion and identifying materials evidencing an absence of a genuine dispute of material fact. *See Celotex*, 477 U.S. at 323; *Rice-Lamar v. City of Ft. Lauderdale, Fla.*, 232 F.3d 836, 840 (11th Cir. 2000). To defeat a properly supported motion for summary judgment, the nonmoving party must "go beyond the pleadings" and identify "specific facts" in the record showing that there is a genuine dispute of material fact

for trial.  *Celotex*, 477 U.S. at 324.  This requires identifying more than "[a] mere scintilla of evidence" in support of the non-moving party's claim; "there must be enough of a showing that the jury could reasonably find for that party."  *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson*, 477 U.S. at 252).  Even a self-serving statement of a litigant can defeat summary judgment if it is based on personal knowledge and is not conclusory in nature.  *See United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018).  Summary judgment is warranted if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

## A.    FMLA Interference and Retaliation

Beginning with the federal claims, under the FMLA, eligible employees are entitled to 12 weeks of leave for a serious health condition that prevents them from performing the functions of their position and have the right following leave to be restored to their previous position, or to an equivalent position.  *See* 29 U.S.C. §§ 2612(a)(1), 2614(a)(1).  *See Munoz v. Selig Enters., Inc.* 981 F.3d 1265, 1274 (11th Cir. 2020); *Drago v. Jenne*, 453 F.3d 1301, 1306 (11th Cir. 2006).  To establish a claim of FMLA interference, an employee must "demonstrate that he was entitled, under the FMLA, to a benefit that he was denied."  *Drago,* 453 F.3d at 1306; *see also Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293 (11th Cir.

2006).  Also, the plaintiff must prove that he was prejudiced or harmed by the alleged FMLA interference to make a *prima facie* case.  *See Ragsdale v. Wolverine World Wide, Inc*., 535 U.S. 81, 89 (2002); *Munoz,* 981 F.3d at 1274–75.  A showing of intent is not required because "the employer's motives are irrelevant." *Strickland v. Water Works & Sewer Bd. of Birmingham*, 239 F.3d 1199, 1208 (11th Cir. 2001).

The Court agrees with the Sheriff that Chandler has failed to establish a triable interference claim.  Chandler was not only restored to his position when he returned, he was promoted.  The interference claim is based on the conduct of Blevins coming to Chandler's home on one occasion to inquire as to when he would return to work and making harassing or disrespectful comments on social media and by phone. However, Chandler himself testified that Blevins came to his home regarding a scheduling matter and Chandler did not recall specifically what was said on social media or by phone.  Even assuming Blevins referenced Chandler's FMLA leave or had been sent by Turner or Vause to inquire about his return to work date, Chandler has offered no evidence of any harm or adverse action from the alleged interference. He was not discouraged from using FMLA leave, he was allowed to use the full amount of FLMA leave that he needed, and he does not assert he was called on to

work during his leave time or pressured to return to work before he was ready. Therefore, the interference claim fails as a matter of law.[17]

A claim for retaliation under the FMLA requires proof that: "(1) [the plaintiff] engaged in statutorily protected conduct; (2) he was adversely affected by an employment decision; and (3) there was a causal connection between the statutorily protected conduct and the adverse employment decision." *Drago*, 453 F.3d at 1307 (discussing retaliation claims in the context of the FMLA, the Age Discrimination in Employment Act, and the FCRA).  In the retaliation context, the plaintiff must also meet "the increased burden of showing that his employer's actions were motivated by an impermissible retaliatory or discriminatory animus."  S*trickland,* 239 F.3d at 1207 (internal quotations omitted).  An "adverse action" is one that "a reasonable employee" would find "materially adverse;" that is, "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination," or in this context, from using FMLA leave.[18] *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57, 68 (2006);[19] *see also Wood v. Gilman Bldg. Prod. Inc*, 769 F. App'x 796, 802

---

[17] Chandler claims in his sur-reply that there is interference because he was not advised of a right to take FMLA leave at the time of his termination.  There is no such claim in the Complaint.

[18] The Eleventh Circuit in *Crawford v. Carroll*, 529 F.3d 961, 973–74 (11th Cir. 2008), explained that the *Burlington Northern* standard is broader than the previously applicable "adverse employment action" standard.

[19] Although *Burlington Northern* is a Title VII case and the Eleventh Circuit has not expressly stated in a published opinion that its "materially adverse" standard applies to FMLA

(11th Cir. 2019) (citing *Burlington* in the FMLA context). Causation requires a showing that the decisionmaker was aware of the protected activity and that the protected activity was not wholly unrelated to the adverse action. *See Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1271 (11th Cir. 2017). Also, close temporal proximity between them, "measured from the last day of an employee's FMLA leave until the adverse employment action at issue occurs," generally provides "sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." *Id.*

The burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to FMLA retaliation claims that are based on circumstantial evidence, as is this case. *Jones*, 854 F.3d at 1270. Under this framework, if the plaintiff establishes a *prima facie* case, the burden shifts to the employer "to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." *Drago*, 453 F.3d at 1307. If the employer carries its burden,

---

retaliation, the court has assumed its applicability in unpublished decisions. *See e.g., Wood,* 769 F. App'x at 802; *Rudy v. Walter Coke, Inc*., 613 F. App'x 828, 830 (11th Cir. 2015) (stating, in the context of an FMLA retaliation claim, that a plaintiff must demonstrate that he suffered a "materially adverse" action); *Bentley v. Orange Cnty., Fla*., 445 F. App'x 306, 309 (11th Cir. 2011) (citing *Burlington* in the FMLA context); *Foshee v. Ascension Health-IS, Inc*., 384 F. App'x 890, 891 (11th Cir. 2010) ("[W]e have not addressed whether the 'materially adverse effect' standard articulated in *Burlington Northern* should apply to claims of FMLA retaliation."). The Court finds it is the appropriate standard in this context. *Accord Pennell v. Judd*, No. 8:19-CV-2433-CEH-TGW, 2022 WL 3345630, at *24 (M.D. Fla. Aug. 12, 2022) (applying *Burlington* to a claim of FMLA).

the *prima facie* presumption is rebutted and "drops from the case." *Id.* (quoting *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 255 n. 10 (1981)).

Chandler can establish that he engaged in protected activity by taking FMLA leave and that his supervisors were generally aware he had taken this leave. As to Chandler's claim of retaliation based on the transfer to Station 4, however, the record does not support the remainder of the *prima facie* case. No reasonable jury could find this action was either adverse or caused by retaliatory animus. The action was not materially adverse because Chandler was promoted to lieutenant on his return from FMLA leave, consequently, his duties necessarily changed, and the record shows that a promotion to lieutenant is routinely associated with a change of station. Chandler admitted that the duties of a lieutenant are the same regardless of the station where the job is performed or whether the individual rides an ambulance or a fire engine—it's the same job.[20] His pay did not change. His hours did not change.[21] His benefits did not change. His duties did not materially change but only varied given the varying type and frequency of the calls received at the different stations due to their location. Someone had to work at Station 4, and the record shows that many employees rotated through Station 4, and many of the chiefs worked out of

---

[20] This is not a case of a supervisor being relieved of his supervisory duties and transferred to perform the duties of a janitor. *See generally McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1070 (11th Cir. 1996).

[21] Chandler complained about mandatory overtime but did not assert that the mandatory overtime resulted from FMLA retaliation.

that station.  In this context, Chandler's subjective view of the transfer to Station 4 as a punitive assignment does not meet the "materially adverse" standard because the Court cannot say that a reasonable emergency medical fire worker would be dissuaded from using FMLA leave by a promotion and the transfer, which involved some different duties at a busy fire station within the same county, but work that is expected of any lieutenant.  *See Burlington,* 548 U.S. at 68.  The Court finds the harm alleged to be trivial, if it can be considered harm at all.

Even assuming the transfer to Station 4 could be considered adverse, there is no *prima facia* showing of causation.  Although the transfer was temporally close in time to Chandler's FMLA use and Chief Hatfield stated that Chandler had been sent to Station 4 because he had been out on FMLA leave, these facts fail to establish causation because it is undisputed that the transfer decision occurred before Chandler took FMLA leave, as Chandler himself testified.  *See Drago,* 453 F.3d at 1308 ("We hold that, in a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation.").  For this reason, Hatfield's subsequent statement is immaterial, and Hatfield was not involved in the transfer decision.

As to the termination, that is a materially adverse action, but Chandler's *prima facie* case fails at causation. The proximity—nearly four months between the end of Chandler's protected leave on June 30, 2018, and his termination in late October 2018—is not close enough to raise an inference of causation on its own. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (stating temporal proximity must be "very close" to raise an inference of retaliation on its own, and noting a three to four month gap is insufficiently close) (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)); *see also Drago*, 453 F.3d at 1308 (noting a three-and-one-half month proximity has been found insufficient to create a jury issue on causation). No other evidence of a retaliatory intent is shown to establish a causal link between Chandler's demotion/termination and his use of FMLA leave.

Moreover, even assuming a *prima facie* case is shown, the Sheriff has offered a legitimate reason for Chandler's termination, and Chandler has no evidence of pretext to rebut it. To show pretext, an employee must establish that "the proffered reason was not the true reason for the employment decision" by showing either that "a discriminatory reason more likely motivated the employer" or that the proffered reason "is unworthy of credence." *Texas Dep't of Cmty. Affs. v. Burdine,* 450 U.S. 248, 256 (1981). In this case, the record confirms that Chandler admitted the reasons offered by the Sheriff for his demotion in his letter to Major Clark and in his

deposition.[22]  Although he offered some explanations, such as he did not agree with how his conduct was characterized, he did not deny the substance of the charges against him and instead took ownership of his conduct.  This resulted in a lesser disciplinary action of demotion.  Chandler further admitted at his deposition that he refused to come in and meet with Chief Vause and told either Vause or McMillian by phone that he would not return to work following the decision to demote him. ECF No. 13–1 at 155-156. This was the reason given for his termination, and Chandler has confirmed its legitimacy.  This Court does not engage in weighing the wisdom of an employer's decision, and here, it cannot be disputed that Chandler was terminated because he refused to continue working in a demoted status.  *See generally, Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (stating the court is not a "super-personnel department" and does not "second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory [or retaliatory] motive.").

## B.    FCRA—Disability Discrimination

Chandler contends he was discriminated against on the basis of a disability or perceived disability.   Under Florida law, the FCRA forbids employers from

---

[22] He also contradicted the letter in his deposition, but his letter provided the basis for the demotion.

"discriminat[ing] against any individual . . . because of such individual's race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status." Fla. Stat. § 760.10(1)(a).  The Florida courts have recognized that disability discrimination claims brought under the FCRA are analyzed under the same framework as the Americans with Disabilities Act ("ADA") and related regulations.  *See Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1221 (11th Cir. 2000); *St. Johns Cnty. Sch. Dist. v. O'Brien,* 973 So. 2d 535, 540 (Fla. 5th DCA 2007).  Florida courts also apply the same *McDonnell Douglas* burden-shifting framework under the FCRA.  *St. Johns Cnty. Sch. Dist.,* 973 So. 2d at 540.

To establish a prima facie case of disability discrimination, "a plaintiff must demonstrate that (1) he has a disability;[23] (2) he is a qualified individual; and (3) he was subject to unlawful discrimination as the result of his disability."  *Id.*  To establish the third element, the plaintiff must prove an adverse employment action that amounts to "a serious and material change in the terms, conditions, or privileges of employment."  *Davis v. Town of Lake Park, Fla*., 245 F.3d 1232, 1239 (11th Cir. 2001) (overruled on other grounds in *Burlington,* as recognized in *Crawford v.*

---

[23] "The ADA defines disability as a (1) physical or mental impairment that substantially limits one or more of the major life activities of an individual; (2) a record of such impairment; or (3) being regarded as having such impairment."  *St. Johns Cnty. Sch. Dist*., 973 So. 2d at 541 (citing *Gordon v. E.L. Hamm & Assocs., Inc.*, 100 F.3d 907, 910 (11th Cir.1996)).  And, a plaintiff is "perceived as" disabled if, among other things, he has an impairment that does not substantially limit major life activities but is treated by an employer as constituting such a limitation.  *Id.* (citing 29 C.F.R. 1614.203(a)(5)).

*Carroll*, 529 F.3d 961, 973–74 (11th Cir. 2008)).   "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.* (indicating that except in unusual circumstances, a change in job duties will rarely amount to an adverse employment action unless it is accompanied by tangible harm).

The Sheriff does not dispute that Chandler has a disability but instead argues the decisionmaker had no notice or knowledge of a disability, that the termination was based on a legitimate, nondiscriminatory reason even assuming a *prima facie* case, and that the transfer decision was not an adverse action.  The Court agrees that Chandler's comment to Turner in a general conversation at work that he suffered from depression and PTSD, with no indication that he needed or requested any accommodation, could not be considered sufficient notice to the employer that he suffered from a disability.[24]  Also, the Court agrees for reasons already stated under a broader standard that the shift assignments and transfer to Station 4 cannot be considered an adverse employment action.[25]  The Eleventh Circuit has noted that "[i]t is important not to make a federal case out of a transfer that is *de minimis*,

---

[24] Chandler states in a second affidavit that they also all knew because he was diagnosed with PTSD in 2008.  The Court finds this conclusory.

[25] And in any event, Chandler did not offer a disability or medical reason to Hatfield that would have suggested he was unable to do the job at Station 4 and needed an accommodation of being transferred back to Station 8 due to a disability.

causing no objective harm and reflecting a mere chip-on-the-shoulder complaint." *Doe v. Dekalb Cnty. Sch. Dist.*, 145 F.3d 1441, 1453 n. 21 (11th Cir. 1998).

When Chandler asked Turner for access to a counselor through the Employee Assistance Program in late August 2018, he told Turner he was experiencing stress from his job that was impacting his home life, with no mention of a disability. Turner provided him the requested access/information.  In the notice of proposed discipline in early October, the Sheriff stated legitimate reasons of Chandler's failure to report to work and his disrespectful confrontation with Newsome. In a predetermination letter, Chandler referenced mental health counseling but did not reference a disability or a history of depression or PTSD, and he referenced feeling that he was treated in a hostile manner on return from FMLA leave (which was taken due to an injury not related to his alleged disability).  Even assuming Chandler also told Major Clark at the hearing that he experienced discrimination and retaliation because of his depression and recent FMLA leave, and assuming this was sufficient notice of a disability, the Sheriff offered legitimate nondiscriminatory reasons for the adverse action, gave a *lesser* discipline of demotion and probation for one year, and offered access to the Employee Assistance Program.  Chandler's argument that the Sheriff did not engage in an interactive process misses the mark, because

Chandler did not request a specific accommodation.[26]  *See Gaston v. Bellingrath Gardens & Home, Inc*., 167 F.3d 1361, 1363 (11th Cir. 1999) (stating "an employer's duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made").  When Chandler requested assistance through mental health counseling through the Employee Assistance Program, he received it, and it was offered again in the letter stating the disciplinary action.  Moreover, Chandler was aware that there was an internal process by which he could file a complaint of discrimination, and he never followed that procedure.  ECF No. 13–1 at 123–24.  The Sheriff also offered a legitimate explanation for Chandler's subsequent termination, and, again, Chandler conceded in his deposition that he refused to accept the discipline and refused to return to work.  Although he qualified his answer in a second affidavit, providing for the first time details that he told Hatfield he needed more time for the meeting because he could not report that day due to his PTSD and wanted to continue counseling, the refusal to grant

---

[26] "An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide reasonable accommodations for the disability—unless doing so would impose undue hardship on the employer." *Lucas v. W.W. Grainger, Inc*., 257 F.3d 1249, 1255 (11th Cir. 2001).  Chandler claims he requested not to be demoted as an accommodation, but this request is unrelated to accommodating any disability or perceived disability that would allow him to do his job. "An 'accommodation' is 'reasonable'—and, therefore, required under the ADA—only if it enables the employee to perform the essential functions of the job," that is, makes him able to do the job in spite of his disability. *LaChance v. Duffy's Draft House, Inc*., 146 F.3d 832, 835 (11th Cir. 1998).

additional time for a termination meeting does not equate with discriminatory animus.

Even if the Court assumes that Chandler can demonstrate a *prima facie* case, he cannot show that the legitimate reasons for his demotion and termination were a mere pretext for disability discrimination. In support, he argues that cursing was not a basis for discipline as it was common in the workplace and that others similarly situated were not subjected to discipline. But the situations described were not equivalent. Chandler was in a dispute with Newsome, a superior, at the time, not a conversation, and Chandler admitted in his letter that his temper got away from him. Chandler did not offer evidence of a similarly situated probationary lieutenant who engaged in insubordination and was treated differently. He also presented no comparator who was similarly situated with regard to the conditions of his termination. Most importantly, as already discussed, Chandler conceded that he stated to Vause or McMillian that he would not return to work demoted. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) ("[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown both that the reason was false, and that discrimination was the real reason.") (emphasis in original). The Court rejects without discussion Chandler's argument that the evidence shows a "convincing mosaic" of discrimination, *Lewis v. City of Union City, Ga.*, 918 F.3d

1213, 1220 (11th Circ. 2019), finding that the circumstantial evidence does not raise an inference of disability discrimination.

## C.     FCRA--Retaliation

Under the FCRA, "[i]t is an unlawful employment practice for an employer . . . to discriminate against any person because that person has opposed any practice which is an unlawful employment practice under this section, or because that person has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this section."  Fla. Stat. § 760.10(7). FCRA retaliation claims are analyzed using the same analytical framework as Title VII. *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1389–90 (11th Cir. 1998)

To make a *prima facie* case for a claim of retaliation, a plaintiff must show "(1) that she engaged in statutorily protected activity, (2) that she suffered an adverse action, and (3) that the adverse action was causally related to the protected activity." *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1134–35 (11th Cir. 2020) (internal quotations omitted).  An adverse action must be materially adverse within the meaning of *Burlington*, as previously described, and "not wholly unrelated" to the protected activity.  *See id.* at 1135. Also, to establish the necessary but-for causation, *see Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013), a plaintiff must show that but for the protected conduct, the employer would not have

taken the adverse action.  *Gogel*, 967 F.3d at 1136 & n.13 (applying but-for causation at the *prima facie* stage).

Retaliation under the FCRA can occur based on protected activity under either the opposition clause or the participation clause.  The Court concludes that Chandler did not engage in statutorily protected activity under either.  There is no viable claim under the participation clause, which requires a showing that the plaintiff "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this section."  Fla. Stat. § 760.10(7).  "This clause protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC [or the Florida Commission on Human Rights]; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC [or the Florida Commission on Human Rights].  *Ceus v. City of Tampa,* 803 F. App'x 235, 246 (11th Cir. 2020) (finding a firefighter's internal grievance did not qualify as protected activity) (citing *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000)).  Therefore, Chandler's internal report about the harassment of others in the workplace is not protected activity under the statute, and he did not make a formal EEOC charge until October 26, 2018.[27]  Regarding the opposition clause, its protections "are not limited

---

[27] Chandler signed the form on October 25 and it was filed on October 26.  There is no indication that any supervisor was aware of it.

to individuals who file formal complaints—it protects those who voice informal complaints as well." *Id.* (citing *Rollins v. State of Fla. Dep't of Law Enf't*, 868 F.2d 397, 400 (11th Cir. 1989)).   However, to qualify as protected activity, the "opposition must be directed at an unlawful employment practice of an employer" because "the opposition of an employee to a co-worker's own individual act of discrimination does not fall within the protection of Title VII." *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997) (internal quotations and marks omitted).   A plaintiff can show protected activity only if he subjectively believed in good faith that the employer was engaged in the unlawful practice and that belief, though mistaken, was objectively reasonable in light of the record. *Id.* at 960.   Chandler's report complained of bullying and he testified that it was not based on any claim of sex discrimination, and his report did not identify any individual engaging in the conduct other than "different firefighters" or "our own members."   Therefore, there is no objectively reasonable belief that he was opposing an unlawful employment practice of the employer.   Moreover, even assuming he could show protected activity, causation is lacking.   Chandler presented no evidence that he would not have been terminated in October 2018 but for his conduct of submitting a report about bullying in January 2018.   The undisputed evidence is to the contrary.

Accordingly, the Sheriff's Motion for Summary Judgment, ECF No. 14, is

**GRANTED**.  The Clerk is directed to enter judgment accordingly, tax costs against

the Plaintiff, and close the file.

**DONE AND ORDERED** this 30th day of September 2022.


*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**